IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN DOE,[*] | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 17 CV 2956 |
| v. | ) |
| | ) Judge Robert W. Gettleman |
| CITY OF NAPERVILLE, | ) |
| DESIREE FARR, | ) |
| JAMES KOUKAL, and | ) |
| ROBERT CARLSON, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff John Doe, a minor, alleges that on the night of Halloween 2014, a police officer ordered him into the backseat of a police car, allowed a drunk woman to enter, and did nothing while the woman kissed him, licked his neck, and ran her hand across his genitals. In his third amended complaint, plaintiff sues four defendants: (1) Desiree Farr, the woman who allegedly molested him; (2) James Koukal, the police officer who allegedly ordered him into the backseat; (3) Robert Carlson, the other police officer on the scene; and (4) the City of Naperville, Koukal and Carlson's employer.

Earlier that evening, plaintiff went to his aunt's house to get an extra pillowcase for storing trick-or-treating candy. Farr, a neighbor, called the Naperville Police Department and said that plaintiff had broken into the house through a window. Koukal and Carlson responded. After they investigated and after they talked to plaintiff, they did not suspect that plaintiff had

---

[*] John Doe is a pseudonym.

committed a crime. Plaintiff alleges that: Carlson nonetheless called his aunt to pick him up; Koukal ordered him to stay in backseat of his police car until plaintiff's aunt arrived; Farr asked Koukal if she could enter the backseat to comfort plaintiff; Koukal agreed; Farr entered; Farr molested him; and Koukal did nothing to protect him.

Plaintiff claims that Carlson and Koukal deprived him of his constitutional rights, 42 U.S.C. § 1983, because they: (1) unreasonably seized him; and (2) failed to protect him from a danger that they created when they let Farr into the backseat. Carlson and Koukal move for summary judgment on both claims. Plaintiff moves for summary judgment on his state-created danger claim.

Carlson is entitled to summary judgment on plaintiff's unreasonable seizure claim. He only asked plaintiff for his aunt's name and phone number—he did not tell plaintiff that he was in trouble, that plaintiff had to wait for his aunt to come pick him up, or that plaintiff had to wait in the police car. His questions would not have made a reasonable twelve-year-old, African American child feel that he could not leave. It was not Carlson, but Koukal who stopped plaintiff from trick-or-treating, and Koukal who asked plaintiff to get into his police car.

Carlson is also entitled to summary judgment on plaintiff's state-created danger claim. After plaintiff got into Koukal's car, Farr asked Carlson if she could talk to plaintiff; Carlson told her to ask Koukal. Telling Farr that she would have to ask Koukal for permission did not create a danger or worsen a danger to which plaintiff was already exposed.

Koukal is not entitled to summary judgment on plaintiff's unreasonable seizure claim. He stopped plaintiff from trick-or-treating, separated plaintiff from his friends, questioned plaintiff about whether he was "trying to get into" his aunt's house, and told plaintiff, "Sit in the car while

2

we call your guardian." A reasonable jury could find that under these circumstances, a reasonable twelve-year-old, African American child would not have felt free to leave.

Neither Koukal nor plaintiff are entitled to summary judgment on plaintiff's state-created danger claim. Genuinely disputed issues of material fact preclude summary judgment for both parties—a reasonable jury could find, or not find, that Koukal knew Farr was drunk and that Koukal consciously disregarded an obvious risk that she would molest plaintiff. Koukal is not entitled to qualified immunity: when a police officer confines a child to the backseat of a police car and lets in a drunk and hostile adult, the child has a clearly established right to the same level of physical safety that the child would have had if the officer had done nothing.

## **BACKGROUND**

The facts below are not genuinely disputed unless otherwise stated. On Halloween 2014, in the early evening, plaintiff—a twelve-year-old, African American boy—was trick-or-treating with three friends. They went to plaintiff's mother's house so that plaintiff could get an extra pillowcase for storing candy. While plaintiff was inside or around the house, Desiree Farr—an adult woman, and one of plaintiff's mother's neighbors—called the police, saying that plaintiff had broken into the house through a window.

Responding to Farr's call, the Naperville Police Department sent two patrol officers: Robert Carlson and James Koukal. Carlson was a Naperville Police Department veteran with 26 years of service; Koukal was a relative newcomer with less than two years. Before Koukal joined the Naperville Police Department, however, he had been with the Naperville Park District Police for two years and with the United States Army Reserve for about ten years.

Koukal arrived first. As he approached the house, he was stopped by Farr, who said that she was the caller. Koukal confirmed her name. Carlson arrived next. After he and Koukal

3

cleared the house and saw nothing, they went back to their police cars. As Koukal walked to his car, plaintiff's three friends were across the street. Koukal went to talk to them. Plaintiff was either with his three friends, or he came out of the house soon after. A neighbor told Koukal, "That's John over there." Koukal, understanding the neighbor to mean that plaintiff lived in the house, told the other boys to go home. Koukal did not suspect that they or plaintiff were involved in criminal activity.

Koukal asked plaintiff who he lived at the house with. Plaintiff said that he sometimes stayed at the house with his mom but lives with his aunt. Koukal believed that plaintiff was either in eighth grade or a freshman in high school. Carlson joined the conversation and asked plaintiff for his aunt's name and phone number. After plaintiff complied, Carlson called plaintiff's aunt, Gwendolyn Upshaw, to tell her where plaintiff was. Upshaw told Carlson that plaintiff was allowed to be at her house. The parties dispute Carlson's response: plaintiff alleges that Carlson commanded Upshaw to come and get plaintiff; Koukal and Carlson allege that Upshaw volunteered to come pick him up. Carlson told Koukal that plaintiff's aunt was coming.

Koukal either ordered plaintiff to sit in the police car or suggested that plaintiff do so. Koukal opened the back door and plaintiff got in. Plaintiff did not complain and was not handcuffed. Koukal walked to the driver's seat and opened the prisoner screen, which was metal on the bottom and plexiglass on top. Even with the prisoner screen open, he could not see below the chest of backseat occupants. The screen stayed open while plaintiff was in Koukal's car. Koukal told plaintiff that he was not in trouble, that he was not under arrest, and that they were waiting for his aunt to pick him up. Koukal did not, however, tell plaintiff that he could leave.

A few minutes after plaintiff got into Koukal's car, Farr went to Carlson's car, which was across the street. Farr asked Carlson if she could speak to plaintiff. Carlson said that plaintiff was

in Koukal's car, so she would have to ask him. Carlson did not know how Koukal would deal with Farr but had seen plaintiff getting into Koukal's car. Carlson then left for five minutes to use the bathroom at a nearby Walgreens.

Farr went to Koukal's car. She told Koukal that she was the one who placed the call and said, "I know who this is. This is John." She asked if she could wait with plaintiff because he looked upset. Koukal told Farr that it would be okay. He opened the backseat door for her. Koukal had never met Farr and had not asked plaintiff or his aunt if they knew Farr. He had not asked Farr for her identification and had not checked if she had any outstanding warrants. He also had not asked plaintiff or his aunt for their consent to Farr entering the backseat. He knew, however, that Farr was not related to plaintiff. The parties dispute whether Farr smelled of alcohol—plaintiff testified that she did; Koukal testified that she did not.

Plaintiff did not tell Koukal that he did not want Farr in the car. Once Farr entered, however, plaintiff started crying. Farr placed her arm around plaintiff and used his sweatshirt to wipe his tears. Plaintiff kept crying. Farr placed plaintiff's arm around her, hugged him, and talked to him. Although all this and the rest of Farr's interactions with plaintiff were captured on a videotape facing the backseat, the parties genuinely dispute the following: Koukal and Carlson's lawyers contend that Farr "tickled plaintiff by pinching the top of his knee"; plaintiff testified that Farr did more than that—she "licked me on my neck, kissed me, and she started rubbing on my private part, like she rubbed her hand across it." The 38-minute videotape is black and white, low-resolution, and obscured at times by Farr's body when she hugs or touches plaintiff. It neither proves nor disproves any party's account of what happened. Plaintiff testified that he was shocked and could not believe that Farr was inappropriately touching him while they were in a police car. He did not, however, tell Farr to leave him alone or tell Koukal that he felt

5

uncomfortable with Farr touching him. Nor did he ask Farr to leave the car or try to leave before his aunt arrived.

Koukal sometimes looked through the prisoner screen to see what Farr was doing with plaintiff. Because Koukal could not see below their chests, he did not see Farr touch plaintiff's legs. He later testified that he thought plaintiff calmed down after Farr started telling jokes.

When Carlson came back from the bathroom, he parked in roughly the same place as he had before. At some point, he might have gotten into Koukal's car—if so, he went back to his own car before plaintiff's aunt arrived. When plaintiff's aunt arrived, Koukal walked plaintiff over to Carlson's car, at which time Farr also left the car. Carlson confirmed the aunt's identity and released plaintiff to her.

Carlson testified that police "generally don't let people walk up on our driver's windows because it's a safety issue," and that Farr "had no business in the call." He also testified that if he had a juvenile in the backseat of his car, he would not place another person in the backseat without running that person's background.

About a month after the incident, the Will County State's Attorney's Office declined to prosecute Farr for criminal sexual abuse. The Naperville Police Department, after an internal investigation, gave Koukal a written reprimand for violating Policy 26.4.2, Attention to Duty: "Employees shall be properly equipped and attentive to their duties at all times and shall perform all duties assigned to them." Other possible policy violations were considered, but whether the Naperville Police Department ever charged Koukal for violating those policies is unclear. One of those policies was Policy 70.3.4, Separation by Age and Gender: "Juvenile detainees will not be transported together in any vehicle with detainee 17 years of age or older. Detainees of the opposite sex will not be transported in the same passenger compartment."

**DISCUSSION**

Plaintiff claims that Officers Carlson and Koukal are liable because each of them: (1) seized him unreasonably; and (2) failed to protect him from a danger that they created. Carlson and Koukal move for summary judgment on both claims; plaintiff moves for summary judgment on his state-created danger claim. Summary judgment is proper when no material fact is genuinely disputed and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is genuinely disputed if the evidence would allow a reasonable jury to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Once the moving party meets its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The court draws all justifiable inferences in favor of the non-moving party. Anderson, 477 U.S. at 255.

**1      Carlson**

Carlson moves for summary judgment on plaintiff's unreasonable seizure and state-created danger claims; plaintiff moves for summary judgment on his state-created danger claim. Carlson's motion is granted and plaintiff's motion is denied.

**1.1      Unreasonable seizure**

The undisputed facts entitle Carlson to summary judgment on plaintiff's unreasonable seizure claim. Under the Fourth Amendment, Carlson is liable if he unreasonably seized plaintiff, and plaintiff was seized if a reasonable twelve-year-old, African American child in his situation would not have felt free to leave. United States v. Mendenhall, 446 U.S. 544, 554 (1980) (holding that the seizure inquiry includes "all the circumstances"); Doe v. Heck, 327 F.3d 492,

510 (7th Cir. 2003) (considering age as a circumstance); United States v. Smith, 794 F.3d 681, 687–88 (7th Cir. 2015) (considering race as a circumstance, in dicta).

Carlson's acts would not have made a reasonable twelve-year-old, African American child feel that he could not leave. Plaintiff agrees that it was Koukal who called plaintiff over and that Carlson joined the conversation later. In that conversation, Carlson asked plaintiff for his aunt's name and phone number. Carlson did not tell plaintiff that he was in trouble, that plaintiff had to wait for his aunt to come pick him up, or that plaintiff had to wait in the police car. A reasonable twelve-year-old, African American child would not have felt that he could not leave simply because a police officer had asked for his aunt's name and phone number.

Although the parties leave unclear where Carlson went or what he did after he called plaintiff's aunt, they agree that Carlson went elsewhere and left plaintiff alone with Koukal. Carlson is not liable for whatever may have happened next. See, e.g., Wolf-Lillie v. Sonquist, 699 F.2d 864, 869 (7th Cir. 1983) ("An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.") (emphasis in original). Plaintiff testified that: (1) he was told to get in the car by one officer; (2) that same officer opened the door for him to get in; (3) no other officer was standing there; (4) a second officer pulled up to the car; and (5) the second officer drove off. The undisputed facts make clear that the first officer was Koukal and that the second was Carlson; plaintiff alleges, and Carlson and Koukal do not dispute, that "Officer Carlson observed Plaintiff getting into Officer Koukal's car." Because Carlson was elsewhere when Koukal told plaintiff to get in the car, and because Carlson's earlier questions would not have made a reasonable twelve-year-old, African American child feel that he could not leave, Carlson is entitled to summary judgment.

**1.2　State-created danger**

Carlson is also entitled to summary judgment on plaintiff's state-created danger claim. Plaintiff's state-created danger claim arises under the Fourteenth Amendment's Due Process Clause. Because the Due Process Clause "imposes upon the state a duty to protect individuals against dangers the state itself creates," King v. East St. Louis School District 189, 496 F.3d 812, 817 (7th Cir. 2007), "people propelled into danger by public employees have a good claim under the Constitution." Paine v. Cason, 678 F.3d 500, 510 (7th Cir. 2012). Under this theory of state-created danger, Carlson is liable if: (1) his affirmative acts increased the likelihood that plaintiff would be molested; (2) his failure to protect plaintiff proximately caused plaintiff to be molested; and (3) his failure to protect plaintiff shocks the conscience. King, 496 F.3d at 817–18.

No reasonable jury could find that Carlson affirmatively increased the likelihood that plaintiff would be molested. After plaintiff got into Koukal's car, Farr approached Carlson's car—which was across the street from Koukal's—and asked Carlson if she could talk to plaintiff. Carlson said that she would have to ask Koukal because plaintiff was in Koukal's car. By telling Farr that she would have to ask Koukal if she could talk to plaintiff, Carlson did not "turn[] a potential danger into an actual one," Sandage v. Board of Commissioners of Vanderburgh County, 548 F.3d 595, 600 (7th Cir. 2008), or "make worse any danger [plaintiff] already faced." Windle v. City of Marion, 321 F.3d 658, 662 (7th Cir. 2003). Plaintiff was exposed to no danger until Koukal opened the backseat of his police car and gave Farr access to plaintiff.

Nor did Carlson worsen the danger that plaintiff already faced even if, as plaintiff testified, Carlson got into the car while plaintiff was being molested. Because Carlson did not increase the danger that Farr posed to plaintiff in the first place, Carlson had no duty to protect plaintiff. To turn a blind eye while Farr molested plaintiff would be contemptible, yet

9

constitutional. See, e.g., Reed v. Gardner, 986 F.2d 1122, 1125 (7th Cir. 1993) ("[T]he police have no affirmative obligation to protect citizens from drunk drivers. Taken to an extreme, police officers could watch drunk drivers stumble to their cars and drive off, weaving across the road, without incurring section 1983 liability.").

Because a reasonable jury could not find that Carlson affirmatively increased the danger to plaintiff, the court need not decide whether Carlson proximately caused plaintiff's injuries, whether his acts shock the conscience, or whether he is entitled to qualified immunity.

**2      Koukal**

Against Koukal, plaintiff brings the same two claims: unreasonable seizure and state-created danger. Koukal moves for summary judgment on both claims; plaintiff moves for summary judgment on his state-created danger claim. Both motions are denied.

**2.1     Unreasonable seizure**

Koukal is liable under the Fourth Amendment if he: (1) seized plaintiff; and (2) did so unreasonably. Doe, 327 F.3d at 510. Koukal concedes that he did not consider plaintiff a criminal suspect and does not dispute that seizing plaintiff would be unreasonable. He argues, however, that he is entitled to summary judgment because no reasonable jury could find that he seized plaintiff at all. The court disagrees because a jury could find that a reasonable twelve-year-old African American child in plaintiff's situation would not have felt free to leave.

Plaintiff testified that on that Halloween evening, he went with three other boys to his mother's house to get another pillowcase for candy. Seeing that the front and back doors were locked, plaintiff walked back to the sidewalk to rejoin his friends and saw them talking with Koukal and Carlson. It was getting dark. Either Koukal or Carlson asked plaintiff, "Are you trying to get into the house? Is this your house?" He said yes. Carlson asked him for his aunt's

name and number. He complied. Koukal told the other boys to go home. Then Koukal told plaintiff, "Sit in the car while we call your guardian," and opened the car door. Plaintiff got in. He did not ask why and did not protest. He "just cooperate[d]."

Taking plaintiff's testimony as true, a reasonable child in his situation would not have felt free to leave. When a twelve-year-old African American child is stopped from trick-or-treating, separated from his friends, questioned about whether he was "trying to get into" a house, and told by a police officer, "Sit in the car while we call your guardian," he might reasonably think that cooperation is his only option. Koukal, of course, tells a different, kinder story: he testified that before he opened his car door, he merely suggested to plaintiff, "[W]hy don't we keep warm. You can sit in my squad car." Koukal and plaintiff "come to this case with their own perceptions, recollections, and even potential biases," and "[i]t is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system." Tolan v. Cotton, 572 U.S. 650, 657 (2014) (vacating summary judgment for a police officer on an excessive force claim because the court of appeals, in granting qualified immunity, "improperly weighed the evidence and resolved disputed issues in favor of the moving party") (citation, alteration, and quotation marks omitted). Whether Koukal seized plaintiff depends on genuinely disputed facts that a jury must decide.

### 2.2 State-created danger

Plaintiff also claims that Koukal is liable under a theory of state-created danger. Because Koukal does not dispute that he affirmatively increased the likelihood that plaintiff would be molested, the merits of Koukal and plaintiff's summary judgment motions turn on: (1) whether a reasonable jury could find that Koukal proximately caused plaintiff's injuries; (2) whether a reasonable jury could find that Koukal's failure to protect plaintiff shocks the conscience; and

(3) whether Koukal is entitled to qualified immunity because plaintiff's Fourteenth Amendment right to due process was not clearly established. King, 496 F.3d at 817–18.

Neither Koukal nor plaintiff are entitled to summary judgment. A reasonable jury could find—or not find—that Koukal's failure to protect plaintiff proximately caused plaintiff's injuries and that his failure to protect shocks the conscience. Koukal is not entitled to qualified immunity: when a police officer confines a child to the backseat of a police car and lets in a drunk and hostile adult, the child has a clearly established right to the same level of physical safety that the child would have had if the officer had done nothing.

**Proximate cause.** Plaintiff and Koukal first dispute whether a reasonable jury could find that Koukal proximately caused plaintiff's injuries. Proximate cause depends on whether a plaintiff was a "foreseeable victim" of Koukal's acts. Buchanan-Moore v. County of Milwaukee, 570 F.3d 824, 828 (7th Cir. 2009). Whether plaintiff was a foreseeable victim depends on whether the dangers that Koukal created: (1) were "familiar and specific"; and (2) had "a limited range and duration." Reed, 986 F.2d at 1127.

A reasonable jury could find that Koukal proximately caused plaintiff's injuries. By giving Farr access to the back seat, Koukal created dangers that were familiar and specific: Farr had just called the police on plaintiff, and drawing all justifiable inferences in plaintiff's favor, Koukal smelled alcohol on Farr's breath and thus knew or suspected that she was drunk. Koukal had not asked Farr for her identification, had not checked if she had outstanding warrants, and had not determined the nature of her relationship with plaintiff. Letting a drunk and unidentified woman into a confined space—a space that Koukal could not fully observe because his view was obstructed by the prisoner screen—with a boy to whom that woman had just been hostile exposes that boy to the familiar and specific dangers of physical and sexual abuse. A jury could

12

find that such dangers are obvious to a reasonable police officer. Cf. L.R. v. School District of Philadelphia, 836 F.3d 235, 245 (3d Cir. 2016) (denying a teacher summary judgment on a state-created danger claim and holding that "many apparent risks of harm"—including the risk of "sexual assault"—made it "foreseeable that releasing a young child to a stranger could result in harm to the child").

The dangers that Koukal created were also limited in range and duration. Farr endangered not the "public at large," but plaintiff alone. Buchanan-Moore, 570 F.3d at 828. The dangers she posed were not "indefinite," but limited to the 34 minutes that she spent in the backseat of Koukal's car. Id. at 829. Letting Farr in thus exposed plaintiff to a "zone of danger" that was neither "generalized" nor "amorphous," id. at 828, but limited in time, place, and victim. Compare id. at 828–29 (affirming the dismissal of a state-created danger claim involving a municipality that released a mentally-ill man without psychiatric medication, reasoning that the man's "propensity for criminal acts" was "without temporal boundaries," and that "[t]he danger posed to [the plaintiff] . . . was shared by the thousands of others who lived in that section of town"), with Reed, 986 F.2d at 1126–27 (reversing the dismissal of a state-created danger claim involving police officers who arrested a sober driver and left a drunk driver with the keys, reasoning that "[d]espite the two hour time lapse and the distance between the place of [the] arrest and the car accident, the events are not sufficiently attenuated to relieve the defendants of section 1983 liability").

Although a closer call, a reasonable jury could also come to the opposite conclusion and find that Koukal did not proximately cause plaintiff's injuries. A jury could credit Koukal's testimony that Farr did not smell of alcohol and find that Farr was not drunk. The jury could also find that Farr, by the time she approached Koukal, had recognized plaintiff and that her hostility

13

had visibly abated. And the jury could from those findings conclude that a reasonable police officer could not have foreseen that a sober, ostensibly friendly person might so brazenly molest a child with a police officer sitting so near.

**Conscience-shocking.** The parties also dispute whether a reasonable jury could find that Koukal's acts shock the conscience. Koukal's acts shock the conscience if he was deliberately indifferent to plaintiff's Fourteenth Amendment right to due process. King, 496 F.3d at 818–19. Koukal was deliberately indifferent if he consciously disregarded dangers that were known or obvious. Armstrong v. Squadrito, 152 F.3d 564, 577 (7th Cir. 1998).

Because a reasonable jury could find that Koukal consciously disregarded the known or obvious dangers of letting a drunk woman into a confined space with a boy—a boy to whom the woman had just been hostile—a reasonable jury could find that Koukal's acts shock the conscience. A jury presented with plaintiff's evidence could infer that:

- Koukal knew that Farr had reported to the police that plaintiff broke into the house;
- Koukal believed that plaintiff was in either eighth or ninth grade;
- Koukal knew that Farr was drunk;
- Koukal knew that Farr was not a relative of plaintiff;
- Koukal knew that Farr claimed to know plaintiff;
- Koukal knew nothing else about Farr's relationship with plaintiff;
- Koukal did not ask plaintiff if he knew Farr;
- Koukal did not ask plaintiff's aunt if she knew Farr;
- Koukal did not ask plaintiff for his consent to Farr getting in the backseat;
- Koukal did not ask plaintiff's aunt for her consent to Farr getting in the backseat;
- Koukal—from his common sense, his many years of police and military experience, and his police department's policy to separate, (1) juvenile detainees from adult

14

detainees, and (2) male detainees from female detainees—knew that placing a drunk and hostile woman with an eighth or ninth grade boy was dangerous;

- Koukal nonetheless opened the backseat door to let Farr in;
- Koukal could not see below plaintiff's chest because his view was partially obstructed by the prisoner screen;
- Koukal noticed that plaintiff started crying when Farr got in the backseat;
- Farr molested plaintiff; and
- Koukal did nothing to protect him.

Drawing those inferences, a reasonable jury could find that Koukal either knew that Farr was molesting plaintiff or consciously disregarded the obvious risk that she would do so. Despite Farr's purported good intentions, a competent police officer in Koukal's shoes would have recognized the possibility that Farr bore plaintiff ill-will or otherwise intended to act inappropriately. A jury could find that for Koukal to open the backseat door, thus giving Farr access to plaintiff—without plaintiff's consent, and knowing that Farr's judgment was impaired by alcohol—ran the obvious risk that Farr would harm plaintiff. Cf. L.R., 836 F.3d at 245 ("We think the risk of harm in releasing a five-year-old child to a complete stranger was obvious."); Whitted v. Dart, No. 12 C 2461, Doc. 125, at 14–15, 2014 WL 2819004, at *7 (N.D. Ill. June 23, 2014) (denying summary judgment on a state-created danger claim and holding that a reasonable jury could find deliberate indifference because "the Sheriff had the opportunity to prevent the foreseeable, dangerous consequences of placing a juvenile in custody with adults"). A reasonable jury could thus find that Koukal was deliberately indifferent to plaintiff's right to due process under the Fourteenth Amendment.

Of course, a jury could instead resolve the disputed facts in Koukal's favor—a jury could, for example, find that Koukal did not know that Farr was drunk, and that despite his training and

experience, the risks were not obvious to him—and could thus conclude that Koukal was not deliberately indifferent. The point is that Koukal's knowledge and mental state are quintessential questions for the jury. See, e.g., Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wisconsin, Inc., 991 F.2d 1249, 1258, 1263–64 (7th Cir. 1993) (collecting cases) (reversing summary judgment for a Native American tribe on a race discrimination claim even though "the stench of racism is unmistakable," commenting that, "Due to the difficulty of proving a subjective state of mind, cases involving motivation and intent are usually not appropriate for summary judgment."); Townsend v. Fuchs, 522 F.3d 765, 774–75 (7th Cir. 2008) (reversing summary judgment for a prison guard on a prison conditions claim, reasoning that, "[T]he dispute over whether Allen knew about Townsend's cell conditions comes down to a good old-fashioned swearing contest that can be resolved only by assessing the credibility of the two men.").

**Qualified immunity.** Although a reasonable jury could find that Koukal violated plaintiff's right to due process, Koukal is nonetheless immune from trial unless plaintiff's right was clearly established at the time of the violation. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The right must be framed in "the specific context of the case, not as a broad general proposition," Saucier v. Katz, 533 U.S. 194, 201 (2001), and its "contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (citation and quotation marks omitted). A right can be clearly established without a case directly on point: "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question," thus giving Koukal "fair warning" that his acts were unconstitutional. Id. at 741 (citation and quotation marks omitted).

Koukal is not entitled to qualified immunity. When a police officer confines a child to the backseat of his police car and lets in a drunk and hostile adult, that child has a clearly established right to the same level of physical safety that the child would have had if the officer had done nothing. That clearly established right to physical safety is an obvious application of the general rule that public officials must provide protection when they needlessly increase a person's risk of harm. See White v. Rochford, 592 F.2d 381, 382 (7th Cir. 1979) ("[T]he unjustified and arbitrary refusal of police officers to lend aid to children endangered by the performance of official duty . . . indisputably breaches the Due Process Clause."); Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir. 1982) ("If the state puts a man in a position of danger from private persons and then fails to protect him . . . it is as much an active tortfeasor as if it had thrown him into a snake pit."); Archie v. City of Racine, 847 F.2d 1211, 1223 (7th Cir. 1988) ("When the state puts a person in danger, the Due Process Clause requires the state to protect him to the extent of ameliorating the incremental risk."); Reed, 986 F.2d at 1127 (7th Cir. 1993) ("[O]fficers may be subject to suit . . . if they knowingly and affirmatively create a dangerous situation for the public and fail to take reasonable preventative steps to diffuse that danger."); Monfils v. Taylor, 165 F.3d 511, 518 (7th Cir. 1998) ("[Taylor] created a danger Monfils would not otherwise have faced. Taylor is not and never was entitled to qualified immunity . . . ."); Paine, 678 F.3d at 510 (7th Cir. 2012) ("It is clearly established that state actors who, without justification, increase a person's risk of harm violate the Constitution."). These cases placed plaintiff's due process right to physical safety "beyond debate," Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011), and thus put Koukal on notice that his acts were unconstitutional even if the "factual circumstances" were "novel." Hope, 536 U.S. at 741.

## **CONCLUSION**

Defendant Robert Carlson's motion for summary judgment (Doc. 69) is granted. Defendant James Koukal's motion for summary judgment (Doc. 69) is denied. Plaintiff John Doe's motion for partial summary judgment (Doc. 56) is denied. This matter is set for a report on status on June 13, 2019, at 9:00 a.m.

**ENTER:** **June 5, 2019**

_____
**Robert W. Gettleman**
**United States District Judge**